PHILLIPS, Circuit Judge.
Medicaid's free-choice-of-provider provision grants Medicaid patients the right to choose for their medical care any qualified and willing provider. 42 U.S.C. § 1396a(a)(23). On May 3, 2016, Kansas sent notices of decisions to terminate (effective May 10) its Medicaid contracts with two Planned Parenthood affiliates, Planned Parenthood of Kansas and Mid-Missouri ("PPGP"), and Planned Parenthood of the St. Louis Region ("PPSLR").[1] The notices cited concerns about the level of PPGP's cooperation in solid-waste inspections, both Providers' billing practices, and an anti-abortion group's allegations that Planned Parenthood of America ("PPFA") executives had been video-recorded negotiating the sale of fetal tissue and body parts. Together, the Providers and three individual Jane Does ("the Patients") immediately sued Susan Mosier, Secretary of the Kansas Department of Health and Environment ("KDHE"), under 42 U.S.C. § 1983, alleging violations of 42 U.S.C. § 1396a(a)(23) and the Equal Protection Clause of the Fourteenth Amendment. The Plaintiffs sought a preliminary injunction enjoining Kansas from terminating the Providers from the state's Medicaid program.
States have broad authority to ensure that Medicaid healthcare providers are qualified to provide medical services-meaning that they are competent to provide medical services and do so ethically. But this power has limits. States may not terminate providers from their Medicaid program for any reason they see fit, especially when that reason is unrelated to the provider's competence and the quality of the healthcare it provides. We join four of five of our sister circuits that have addressed this same provision and affirm the district court's injunction prohibiting Kansas from terminating its Medicaid contract with PPGP. But we vacate the district court's injunction as it pertains to PPSLR
*1211 and remand for further proceedings on that issue. Though the Plaintiffs have provided affidavits from three Jane Does concerning their past and expected medical care from PPGP, the Plaintiffs have not provided affidavits from any persons receiving or expecting to receive medical care at PPSLR. Hence the Plaintiffs have failed to establish any injury they will suffer from the termination of PPSLR, meaning they have failed to establish standing to challenge that termination. But on this record, we cannot determine whether PPSLR itself can establish standing, an issue the district court declined to decide but now must decide on remand.[2] Though Kansas has not raised this standing issue, we have an independent duty to assure ourselves of the district court's subject-matter jurisdiction. See City of Colo. Springs v. Climax Molybdenum Co. , 587 F.3d 1071, 1078-79 (10th Cir. 2009).
BACKGROUND
I. The Medicaid Act and Kansas Regulations
The Medicaid Act's free-choice-of-provider provision states that "any individual eligible for medical assistance ... may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required ... who undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23). This provision "guarantees that Medicaid beneficiaries will be able to obtain medical care from the qualified and willing medical provider of their choice." Planned Parenthood of Gulf Coast, Inc. v. Gee , 862 F.3d 445, 450 (5th Cir. 2017). Because the Medicaid Act is mostly administered by the states, the Act empowers states to determine whether entities are medical providers "qualified to perform the service or services required." States may exclude Medicaid providers-that is, withhold reimbursements for medical services provided to patients-"for any reason for which the [federal] Secretary [of Health and Human Services] could exclude the individual or entity from participation in a program under" specified statutes. 42 U.S.C. § 1396a(p)(1) ; 42 C.F.R. § 1002.3(a)-(b). As grounds for excluding the Providers from its Medicaid plan, Kansas has raised 42 U.S.C. § 1320a-7(b)(5)(B), (b)(12)(B).
Kansas, like all states, issues regulations to administer its Medicaid program. These regulations govern when, why, and how Kansas may terminate contracts between its Medicaid program and healthcare providers. Kan. Admin. Regs. § 30-5-60(a). If Kansas decides that a provider is no longer competent to provide medical services, it must send written notification to the provider of its intent to terminate the provider and its reasons for doing so. Kan. Admin. Regs. § 30-5-60(c). This notification must also inform the provider that it has a right to appear before the KDHE between five and fifteen days from the date the notice is mailed or served on the provider. Id.
If the state decides to terminate the provider, the provider may request a hearing from Kansas's Office of Administrative Hearings ("OAH") within thirty-three days after receiving notice of termination. Kan. Admin. Regs. §§ 30-7-67 - 68. According to Kansas, this decision to terminate "becomes final only after the time for a formal *1212 administrative hearing has passed." Appellant's Opening Br. at 6 (citing Kan. Admin. Regs. § 30-7-64 - 104 ). If the provider is dissatisfied with the results of this hearing, it may request a rehearing. Id. If, after that, it is still dissatisfied, the provider may appeal to state court. See Kan. Stat. Ann. § 77-601 -31.
II. Planned Parenthood's Alleged Wrongdoing
Planned Parenthood affiliates, many of which are located in areas with shortages of primary-care providers, deliver essential services to Medicaid recipients. PPGP has two health centers in Kansas and three in Missouri, and PPSLR has one health center in Missouri that also serves Kansas Medicaid patients. The Providers' services include annual health exams; different types of contraception along with contraceptive counseling; breast- and cervical-cancer screening ; cervical-cancer treatment; screening and treatment for sexually transmitted infections; human papillomavirus vaccinations ; pregnancy testing and counseling; and other health services.[3] Though some Planned Parenthood clinics also perform abortions, Medicaid seldom pays for abortions. See, e.g. , Harris v. McRae , 448 U.S. 297, 302-03, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (explaining that the Hyde Amendment prohibits using federal Medicaid funds to reimburse the cost of abortions except in limited circumstances such as rape or incest). The Patients chose Planned Parenthood for reproductive-healthcare services for many reasons, including the quality and availability of the services and expertise in reproductive healthcare.
In July 2015, the anti-abortion group Center for Medical Progress ("CMP") released on YouTube a series of edited videos purportedly depicting PPFA executives negotiating with undercover journalists for the sale of fetal tissue and body parts. Kansas alleges that the videos demonstrate that "Planned Parenthood manipulates abortions to harvest organs with the highest market demand" and that PPFA executives are willing to negotiate fetal-tissue prices to obtain profits. Appellant's Opening Br. at 7. According to Kansas, this evidence matters because "PPFA controls its 'affiliate' organizations, including [PPGP] and PPSLR." Id. Neither PPGP nor PPSLR is the subject of the videos and it is undisputed that neither participates in fetal-tissue donation or sale.
To prove PPFA's control over and affiliation with the Providers, Kansas claims that (1) "PPFA and its affiliates make no apparent effort to keep their finances separate"; (2) PPFA compiles a yearly " 'combined balance sheet,' " which "aggregate[s] 'revenue and expenses' " for the entire Planned Parenthood organization; (3) according to its 2014 tax return, PPFA transferred over $50 million to its affiliates; (4) PPFA drafts rules of procedure and operation for its affiliates and trains its affiliates' officers and employees in "management and medical practices"; and (5) PPFA's legal counsel represented PPGP and PPSLR in their meeting with the KDHE. Id. at 7-8 (quoting Appellant's App. at 479-82).
Based on CMP's videos of the PPFA executives, Kansas began investigating the Providers. In August 2015, Kansas's Board of Healing Arts ("BOHA"), the agency primarily responsible for medical licensure and regulation, requested from PPGP copies of "treatment records related to abortion procedures or stillbirths ... in which *1213 fetal organs or tissues were transferred for any purpose other than those" permitted by law. Appellant's App. at 208-11. On January 7, 2016, the BOHA determined that, "[a]fter careful review of the investigative materials, ... no further action will be taken at this time." Id. at 215.
On December 16, 2015, Kansas's Bureau of Waste Management ("BWM") also initiated a solid-waste investigation under Kan. Admin. Regs. § 28-29-16 of a PPGP-operated clinic in Overland Park, Kansas. "[O]ut of concern for clinic and patient privacy and safety," PPGP employees stopped the inspectors from taking photographs but invited the inspectors to finish their inspection visually. Planned Parenthood of Kan. & Mid-Mo. v. Mosier , No. 16-2284-JAR-GLR, 2016 WL 3597457, at *5 (D. Kan. July 5, 2016). PPGP employees also refused to turn over waste-disposal-vendor lists-which would have become public information subject to the Kansas Open Records Act had PPGP turned over the lists to the investigators-because the PPGP employees were concerned about "the history of harassment toward companies that work with Planned Parenthood." Appellee's Response Br. at 6. Kansas claims that the inspectors were thus "[u]nable to complete their inspection," so they left the clinic. Appellant's Opening Br. at 10-11. Kansas alleges that PPGP's conduct hindered the investigation, though BWM never cited PPGP for any violation related to the investigation.
On January 5, 2016, after counsel for BWM guaranteed the privacy of PPGP's patients, PPGP permitted the inspectors to take photographs on their return visit. The BWM inspectors left a report with PPGP's clinic employees, stating that BWM had found no violations. Later, on January 15, 2016, after PPGP had taken the necessary steps to make its vendor information confidential, PPGP provided BWM the requested waste-vendor information as well. Though Kansas points out that this was "an entire month after the first inspection," id. at 11, in reality, BWM had granted PPGP extra time so that PPGP could document its request to keep the information confidential.
Though Kansas never investigated PPSLR, the Missouri Attorney General did. In September 2015, after looking into PPSLR's fetal-tissue practices, the Missouri Attorney General's office announced that it had found no evidence of wrongdoing.
Relevant to this appeal, Kansas also notes that "[a]llegations ... emerged that Planned Parenthood offices around the country have engaged in questionable billing practices, including in the nearby states of Oklahoma and Texas." Id. at 8-9. And it claims that "Planned Parenthood's practices have prompted numerous lawsuits under the False Claims Act ('FCA')." Id. at 9.
III. Termination Proceedings & District Court Case
On March 10, 2016, about two months after Kansas's inspection of one of PPGP's clinics and two months after Kansas Governor Sam Brownback announced that he had "signed legislation stopping most taxpayer funding from going to Planned Parenthood," and that "[t]he time had[d] come to finish the job," Kansas issued notices of intent to terminate PPGP and PPSLR as state Medicaid providers.[4] Governor Sam Brownback, 2016 State of the State (Jan. 12, 2016) (transcript available at https://governor.kansas.gov/2016-state-of-the-state-january-12-2016/). Those notices informed the Providers that, under Kan. Admin. Regs. § 30-5-60(a), Kansas "intend[ed] to terminate [their] participation *1214 in" Kansas's state Medicaid program. Appellant's App. at 78. Kansas cited the following paragraphs from § 30-5-60(a) : "(2) noncompliance with applicable state laws, administrative regulations, or program issuances concerning medical providers; (3) noncompliance with the terms of a provider agreement; (9) unethical or unprofessional conduct; and (17) other good cause."Id.
The notices also informed the Providers that they could each challenge their proposed terminations in administrative reviews, where they would "have the opportunity to present any relevant evidence" regarding their terminations. Id. PPGP's administrative review was scheduled for March 23, 2016, and PPSLR's was scheduled for March 22, 2016. The notices included attachments listing the state's reasons for terminating the Providers-including the CMP videos, PPGP's supposed lack of cooperation during the waste disposal inspections, and the FCA allegations in neighboring states.
Together, the Providers participated in an administrative review on April 29, 2016. At this review, the Providers' counsel presented evidence and argued against termination. But on May 3, 2016, Kansas sent each Provider a "Notice of Decision to Terminate," which provided that "[a]fter thorough review of all information presented, ... your participation in [Kansas's state Medicaid program] will be terminated effective May 10, 2016. " Id. at 51, 53. The notices also informed the Providers that, under Kan. Admin. Regs. § 30-7-64, they had the right to "request a fair hearing" with the OAH within thirty-three days of the termination notice. Id.
Instead of requesting a hearing to review the terminations, the Providers, the Patients, and eleven individual PPGP and PPSLR employees (whose charges were later dropped after Kansas reconsidered and reversed its decision to terminate them from its state Medicaid program) sued Kansas under 42 U.S.C. § 1983, alleging violations of the Medicaid Act and the Equal Protection Clause of the Fourteenth Amendment. The Patients each had their own reasons for choosing PPGP for reproductive-health services. Jane Doe #1 chose PPGP as a provider because it was the only provider that would accept her as a patient (because she was not pregnant) and schedule an annual appointment for her within a reasonable time. Jane Doe #2 is a long-time PPGP patient who trusts the provider's expertise in reproductive health care and relies on the PPGP for regularly administered birth-control shots. Jane Doe #3, who was pregnant when the lawsuit was filed, chose PPGP because she appreciated the continuity of having one reproductive-health-care provider and wanted to obtain birth control after giving birth.
The day after filing their lawsuit, the Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction. On June 7, 2016, after Kansas twice continued the hearing date and agreed to extend the effective termination date to July 7, the parties argued the case before the district court. Kansas now argues that extending the termination date from May 10 to July 7 meant that the Providers had until August 10 to seek a hearing before the OAH. Kansas also notes that PPGP's Medicaid contract with the state dictated that the contract would terminate thirty days after "notification from the State that the provider's state fair hearing rights have expired or the state fair hearing has been completed related to the Medicaid termination." Id. at 586. To Kansas, this means that "the [termination] notice would have had no effect on [PPGP] until September 10, 2016." Appellant's Opening Br. at 13. On July 5, the district court granted the Plaintiffs' request and issued a temporary restraining order and preliminary injunction. Mosier , 2016 WL 3597457, at *26.
*1215 In granting the Plaintiffs' request for relief, the district court held that the case was ripe, that the Plaintiffs[5] had standing, and that abstention wasn't necessary under Younger v. Harris , 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Id. at *8. On the merits, the district court found that the Patients had a private right of action and were likely to succeed on their free-choice-of-provider claim under the Medicaid Act. Id. at *14-*22. Specifically, the court concluded that states could not interfere with patients' choice of providers for reasons other than the providers' professional competence or fitness to provide medical services. Id. at *18. It also found that the Plaintiffs had met the other requirements for injunctive relief: that the Plaintiffs would suffer irreparable harm absent the requested relief, that the balance of harms favored the Plaintiffs, and that the injunction served the public interest. Id. at *22-*25. The district court declined to rule on the Equal Protection claim. Id. at *14. Kansas appealed.
ANALYSIS
First, we address Kansas's arguments regarding standing, ripeness, and Younger abstention. Then, we move on to address the claim's merits. Specifically, we decide whether the Patients have a private right of action under the Medicaid Act, and whether they have met the requirements necessary to show that they are entitled to injunctive relief.
I. Justiciability
The United States Constitution empowers federal courts to address "Cases" and "Controversies." U.S. Const. art. III § 2, cl. 1. The cases-and-controversies requirement manifests in the dual justiciability doctrines of standing and ripeness. Kansas maintains that the district court erred in concluding that the Plaintiffs had standing and that the case was ripe.
A. Standing
We review de novo a district court's finding of standing. New Mexico v. Dep't of Interior , 854 F.3d 1207, 1215 (10th Cir. 2017). "The constitutional requirements for standing are (1) an injury in fact, (2) a causal connection between the injury and the challenged act, and (3) a likelihood that the injury will be redressed by a favorable decision." Id. at 1214-15 (quoting Roe No. 2 v. Ogden , 253 F.3d 1225, 1228-29 (10th Cir. 2001) ). Kansas contends that the Plaintiffs failed to show that their injury was imminent and fairly traceable to Kansas's actions.
1. Injury in Fact
For standing, a plaintiff's injury must be "actual or imminent, not conjectural or hypothetical." Lujan v. Defs. of Wildlife , 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quoting Whitmore v. Arkansas , 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) ). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a ' "substantial risk" that the harm will occur.' " Susan B. Anthony List v. Driehaus , --- U.S. ----, 134 S.Ct. 2334, 2341, 189 L.Ed.2d 246 (2014) (quoting Clapper v. Amnesty Int'l USA , 568 U.S. 398, 409, 414 n.5, 133 S.Ct. 1138, 185 (L.Ed.2d 264 2013) ). Kansas argues that the Plaintiffs failed to show injury in fact because (1) it had issued only a preliminary, not final, decision and (2) the Plaintiffs' injuries are too speculative.
First, Kansas claims that only after the Plaintiffs had an administrative hearing *1216 (which took place on April 29), "may [it] then issue a written preliminary decision, setting forth the effective date of the termination and the basic underlying facts supporting the order." Appellant's Opening Br. at 6. And Kansas goes on to argue that the "preliminary decision ... becomes final only after the time for a formal administrative hearing has passed."Id. (citing Kan. Admin. Regs. §§ 30-7-64 - 104 ). But Kansas's use of the term "preliminary" is without support in the statute. The regulations provide that "[i]f the decision is to terminate, a written order of termination shall be issued, setting forth the effective date of the termination and the basic underlying facts supporting the order." Kan. Admin. Regs. § 30-5-60(c). Thus, we reject Kansas's argument that its decision was preliminary rather than final.
Second, Kansas claims that the Plaintiffs' injuries are speculative because the Providers "refused to complete the administrative process," so no one can say whether they would have been terminated at all. Appellant's Opening Br. at 20. This argument hinges on Kansas's characterization of the termination letters and their effect. According to Kansas, the notices it sent to the Providers were "far from ... final termination[s]," but rather were "effectively ... complaint[s] that the Providers could formally contest ... or admit." Id. at 21. The providers had until August 10 to administratively appeal Kansas's decision to terminate them from the Medicaid program-thirty-three days from the termination's extended effective date of July 7. And Kansas says that under its contracts with PPGP, it couldn't cut the Provider's funding until September 10-thirty days after the expiration of the Providers' right of appeal.[6] See Kan. Admin. Regs. § 30-7-68.
This argument fails. As did the district court, we read the notices of termination literally. See Mosier , 2016 WL 3597457, at *9. The letters' plain language precludes us from treating them as mere warnings of possible future events. The March 10 letters that Kansas sent to the Providers were titled, "Notice of Intent to Terminate," and the May 3 letters were titled, "Notice of Decision to Terminate." Appellant's App. at 51, 53, 78, 83 (emphasis added). Also, the second letters were final because they stated that "it is the decision of [Kansas] that your participation in [Kansas's Medicaid Program] will be terminated," and that the Providers' terminations would be "effective May 10, 2016." Id. at 51, 53. This date was extended to July 7 only because Kansas requested more time to respond to the Plaintiffs' motion for preliminary injunction. Though the Providers' statutory right to appeal the termination may have delayed the date that Kansas cut off the Providers' funding, Kansas doesn't explain how that delay would change the legally effective date of the termination.[7]
In fact, as the district court noted, Kansas's "position on the effective date of termination *1217 has been a moving target." Mosier , 2016 WL 3597457, at *8. After the Providers' April administrative hearing, Kansas specifically declined the Plaintiffs' request to delay any termination decisions for thirty days from the date of the final terminations. Instead, Kansas made the effective termination date May 10, just a week from the date of the final termination letters. Kansas also rejected the district court's proposal of a mutually-agreed injunction that would "freeze the status quo" until September. Id. The first time Kansas argued that the terminations wouldn't take effect until September 10 was on May 31, in its response to the Plaintiffs' motion for preliminary injunction. And Kansas provided no concrete assurances to support this claim, refusing to draft even a simple statement attesting to the fact that it wouldn't cut off funding until September 10.
In light of such conduct, Kansas's claim that it wouldn't cut off funding to the Providers until September 10 is unpersuasive. We agree with the district court that Kansas cannot "have its cake and eat it too" by insisting that the terminations wouldn't be effective until September, yet refusing to agree to delay enforcement by guaranteeing that September effective date. Id. at *9. We also agree with the district court's position that "[t]he fact that [Kansas] is unwilling to put its counsel's representations into a stipulated order that would apply to both providers is entirely inconsistent with its position that this dispute is premature." Id.
In any case, we conclude that the Plaintiffs faced a substantial risk of injury from the moment Kansas sent its final notices of termination. Although the termination decisions would not have gone into effect until July 7, 2016 (accounting for Kansas's litigation-related extensions), the state "ha[d] already acted to terminate [the Providers'] Medicaid provider agreements; only the effect of [those] termination[s] ha[d] yet to be implemented." Gee , 862 F.3d at 455. Because the Plaintiffs chose not to pursue an administrative appeal, only Kansas's "unilateral reversal" of its terminations could have saved the Plaintiffs from injury, even accounting for all of the delays built into the termination process. Mosier , 2016 WL 3597457, at *11. As Kansas itself states, we must determine standing "as of the time the action is brought." Appellant's Opening Br. at 22 (quoting Utah Ass'n of Ctys. v. Bush , 455 F.3d 1094, 1099 (10th Cir. 2006) ). And the Patients, in particular, "need not wait to file suit until [the Providers are] forced to close [their] doors to them and all other Medicaid beneficiaries." Gee , 862 F.3d at 455. We do not think a two-month delay-from July 7 to September 10-renders the injuries too distant or speculative to confer standing on the Plaintiffs.
2. Causal Connection
Kansas alternatively argues that the Plaintiffs lack standing because their injuries *1218 resulted from their own failure to "use available procedures to remedy an alleged injury," rather than Kansas's actions, and thus are not traceable to Kansas. Appellant's Opening Br. at 23.
Kansas correctly states that a plaintiff cannot show that a defendant caused its injuries if the plaintiff's injuries resulted from its own acts or failures to act. See Clapper , 568 U.S. at 415, 133 S.Ct. 1138 (concluding that plaintiffs challenging a surveillance statute couldn't show standing based on actions they took to protect themselves against hypothetical governmental surveillance). To support its argument that the Plaintiffs caused their own injuries, Kansas relies on National Family Planning & Reproductive Health, Inc. v. Gonzales , 468 F.3d 826, 828 (D.C. Cir. 2006). There, the D.C. Circuit held that a plaintiff-association lacked standing to challenge an anti-discrimination law for vagueness-the association argued that it couldn't comply with both the new law and existing regulations because they conflicted-in part because the association could have cured its uncertainty by asking the federal Department of Health and Human Services ("HHS") for clarification. Id. at 831. Kansas claims that, like the association in Gonzales , the Plaintiffs here could have avoided injury by pursuing and completing the administrative-appeal process.
But the Plaintiffs' dilemma is dissimilar from that in Gonzales . In Gonzales , HHS could have prevented the plaintiff-association from suffering any injury by explaining how it would implement the new law harmoniously with the existing regulations. Id. Here, Kansas had set a termination date for the Providers' Medicaid contracts, even if they could have opted to pursue an administrative appeal. But nothing in the record suggests that the appeal itself would have tolled the terminations, and the regulations contradict that position.[8] See Kan. Admin. Regs. § 30-7-66(a)(1). This means that, absent injunctive relief, Kansas would have stopped funding the Providers within two months. The Plaintiffs could have avoided injury only by pursuing their administrative appeal and winning, and nothing required them to exercise that right to appeal. But even if the Plaintiffs had appealed the termination, Kansas had refused to stipulate that it would continue funding the Providers until September. And, unlike the Providers, the Patients had no administrative remedies available, and therefore no exhaustion requirements to satisfy. See Gee , 862 F.3d at 455. Therefore, Gonzales is inapposite.
We agree with the district court's decision not to "impose an indirect exhaustion requirement by finding that Plaintiffs caused their own injury by failing to pursue administrative remedies." Mosier , 2016 WL 3597457, at *12. The Plaintiffs met their burden of showing that Kansas's actions created a substantial risk of injury, so they had standing to sue the state.
*1219 B. Ripeness
Kansas next argues that this case is not ripe for adjudication because the Plaintiffs didn't complete the administrative-appeal process. Ripeness is a prerequisite to justiciability with both constitutional and jurisdictional components. See United States v. Bennett , 823 F.3d 1316, 1325 (10th Cir. 2016). We review de novo the district court's ripeness finding. Roe No. 2 , 253 F.3d at 1231. Ripeness doctrine ensures that courts don't interfere with agency action until it has progressed from abstract disagreement to a formal decision with concrete effects. Farrell-Cooper Min. Co. v. U.S. Dep't of Interior , 728 F.3d 1229, 1234 (10th Cir. 2013). To determine a claim's ripeness, we evaluate (1) its fitness for judicial resolution and (2) the hardship the parties would suffer if the court declined to hear the case. Id.
1. Fitness for Judicial Resolution
"[T]o determine the fitness of issues for review, we may consider 'whether judicial intervention would inappropriately interfere with further administrative action' and 'whether the courts would benefit from further factual development of the issues presented.' " Id. at 1234-35 (quoting Sierra Club v. Dep't of Energy , 287 F.3d 1256, 1262-63 (10th Cir. 2002) ). Other relevant factors include: "(1) whether the issues involved are purely legal, (2) whether the agency's action is final, (3) whether the action has or will have an immediate impact on the petitioner, and (4) whether resolution of the issue will assist the agency in effective enforcement and administration." Id. at 1235 n.3 (quoting Los Alamos Study Grp. v. Dep't of Energy , 692 F.3d 1057, 1065 (10th Cir. 2012) ). In sum, "[a]n agency's action will be ripe for review where 'the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.' " Mosier , 2016 WL 3597457, at *9 (quoting Nat'l Park Hosp. Ass'n v. U.S. Dep't of Interior , 538 U.S. 803, 807-08, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003) ).
Kansas's arguments on this point are related to its arguments on standing. The state claims that the administrative actions it took in this case were not final. Rather, it argues, the Plaintiffs could have requested a formal hearing and then a rehearing before the OAH. See Kan. Admin. Regs. §§ 30-7-68, 30-7-77. If they were dissatisfied with the outcome of those proceedings, they could then have challenged those decisions before a state appeals committee, and then, finally, in Kansas state court. See Kan. Admin. Regs. § 30-7-78 ; Kan. Stat. Ann. §§ 77-601, 77-607.
The district court disagreed, concluding that the "termination notices represent concrete actions by the KDHE that threatened to harm Plaintiffs by excluding [PPGP] and PPSLR as Medicaid providers, notwithstanding the option of an administrative appeal." Mosier , 2016 WL 3597457, at *9. The district court pointed out that if the Providers didn't appeal, their final termination would stand (which, we note, would have deprived the Patients of their provider of choice). Id. at *10. Further, the district court noted that "where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." Id. (quoting Medimmune, Inc. v. Genentech, Inc. , 549 U.S. 118, 128 & n.8, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) ). Finally, the district court found that the case involved primarily legal questions that did not require agency expertise or significant factual development. Id. Therefore, it concluded that the Plaintiffs' claims were ripe for judicial review. Id. at 11.
*1220 Again, we agree with the district court's thoughtful analysis, this time on this case's fitness for judicial resolution. "[B]oth parties have submitted evidence on these issues, and ... neither party requested an evidentiary hearing on the motion for preliminary injunction." Id. at 10. This implies that no substantial factual disputes remained, and that the questions we must now answer are primarily legal questions. Kansas has presented its grounds for terminating the Providers, and it agrees that the propriety of the preliminary injunction rests on "whether the Providers' conduct and corporate affiliations justify the decision to terminate." Appellant's Opening Br. at 29. Though Kansas characterizes these issues[9] as factual rather than legal, the district court found it telling that after the parties had one evidentiary hearing, even if it was informal, neither party later requested an evidentiary hearing on the motion for preliminary injunction. Mosier , 2016 WL 3597457, at *10. Kansas presented three grounds for terminating the Providers and supported its reasons with evidence. Further agency action was therefore unnecessary for the district court to determine "whether, as a matter of law, any of those grounds permit [Kansas] to terminate [PPGP's and PPSLR's] Medicaid provider agreement without violating Medicaid's free-choice-of-provider requirement." Gee , 862 F.3d at 456.
And, because the Providers had clearly stated that they did "not intend to pursue" further administrative appeal, Appellee's Response Br. at 58, the Patients' injuries are "sufficiently likely to happen to justify judicial intervention," Gee , 862 F.3d at 456 (quoting Pearson v. Holder , 624 F.3d 682, 684 (5th Cir. 2010) ). Again, significantly, the Patients did not participate in the April 29 informal hearing and they had no administrative remedies available to them, so only "through a § 1983 action" in federal court could they "vindicate their federal right" to select the qualified provider of their choice. Appellee's Response Br. at 20; see Gee , 862 F.3d at 455. Absent further administrative action by the Providers, the terminations were final for justiciability purposes because they would have become effective as of the dates stated in the termination letters. In other words, because the future held no uncertain events, the termination letters were not "of a merely tentative or interlocutory nature." Appellant's Opening Br. at 25-26 (quoting Friends of Marolt Park v. U.S. Dep't of Transp. , 382 F.3d 1088, 1093-94 (10th Cir. 2004) ); see also Gonzales , 64 F.3d at 1499.
2. Hardship
Kansas also contends that the Plaintiffs failed to show that they would face hardship absent an injunction because possible future injury does not amount to hardship and the Providers' terminations were not final. We reject this argument for the same reason already given. Because the Providers chose not to appeal their terminations, the terminations were final and would have become effective no later than September 10. If this had happened, the Patients would have likely "suffer[ed] hardship by being denied access to the provider of their choice under 42 U.S.C. § 1396a(a)(23) and to medical services at [the Providers'] facilities." Gee , 862 F.3d at 457. Therefore, the Plaintiffs' claims are ripe.
*1221 II. Younger Abstention
Kansas next claims that the district court erred by declining to abstain under Younger . We review de novo the district court's decision on whether to abstain under Younger . Amanatullah v. Colo. Bd. of Med. Exam'rs , 187 F.3d 1160, 1163 (10th Cir. 1999). We first note that "abstention 'is the exception, not the rule,' and hence should be 'rarely ... invoked.' " Brown ex rel. Brown v. Day , 555 F.3d 882, 888 (10th Cir. 2009) (omission in original) (quoting Ankenbrandt v. Richards , 504 U.S. 689, 705, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992) ).
Younger abstention stems from the federal government's deference to and respect for the state government and its function. Younger , 401 U.S. at 44, 91 S.Ct. 746. "[F]or Younger abstention to apply, there must be 'an ongoing state judicial ... proceeding, the presence of an important state interest, and an adequate opportunity to raise federal claims in the state proceedings.' " Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah , 790 F.3d 1000, 1008 (10th Cir. 2015) (quoting Seneca-Cayuga Tribe of Okla. v. Oklahoma ex rel. Thompson , 874 F.2d 709, 711 (10th Cir. 1989) ). We conclude that no ongoing state proceedings precluded the district court from exercising jurisdiction.
Here, the issue is whether the Providers' right to appeal after their April 29 evidentiary hearing and after the resulting termination decisions would amount to an administrative proceeding entitled to Younger abstention. To decide this question, we ask "whether there is an ongoing proceeding," and then we "decide whether that proceeding is the type of state proceeding that is due the deference accorded by Younger abstention." Brown , 555 F.3d at 888 (first emphasis added).
A. Administrative Proceeding Not Ongoing
Kansas argues that state administrative proceedings were "well underway" and remained ongoing because the Providers still had the right to seek a formal hearing until August 10. Appellant's Opening Br. at 31-32. The district court disagreed, concluding that state administrative proceedings had not yet begun.[10] Mosier, 2016 WL 3597457, at *12.
Before the Plaintiffs filed their § 1983 lawsuit and motion for preliminary injunction, the following events had taken place: (1) two different Kansas agencies had investigated the Providers to determine whether they had improperly sold or disposed of fetal tissue, and both agencies cleared the Providers of wrongdoing; (2) Kansas had sent the Providers notices of intent to terminate; (3) Kansas and the Providers had participated in one evidentiary hearing; and (4) Kansas had sent the Providers notices of decision to terminate with a termination date of May 10. Kansas argues that these decisions weren't final. But again, had the Providers taken no further action-and nothing required the Providers to take further action-those terminations would have become effective. In other words, neither party would have had anything left to do to execute the *1222 terminations; the clock was running on certain termination.
After the Providers received Kansas's notices of termination, they had an optional right to challenge these decisions at an administrative hearing. But "no administrative proceeding commences until or unless [the Providers] appeal[ ], ... and [the Providers] ha[ve] foresworn that option." Planned Parenthood Gulf Coast, Inc. v. Kliebert , 141 F.Supp.3d 604, 633 (M.D. La. 2015). Kansas tries to turn the Providers' right to initiate future state administrative proceedings into present, ongoing proceedings, claiming that "[b]ut for the district court's injunction, the state proceeding would have gone forward." Appellant's Opening Br. at 35. Kansas is mistaken: absent the district court's injunction, the termination would have gone into effect. That is so because the Providers had decided not to proceed with an administrative appeal. So nothing would have stood in the way of the termination being imposed on May 10 as promised absent a unilateral reversal. Because the Providers chose not to appeal this decision to the OAH, Kansas can point to no ongoing state proceedings.
B. Not the Type of Proceeding Entitled to Younger Abstention
For similar reasons, even if proceedings were ongoing, they aren't the type requiring Younger abstention. Relevant to this appeal, civil enforcement proceedings merit abstention under Younger . Sprint Commc'ns, Inc. v. Jacobs , 571 U.S. 69, 134 S.Ct. 584, 588, 187 L.Ed.2d 505 (2013). Civil enforcement proceedings are generally " 'akin to a criminal prosecution' in 'important respects,' " and "are characteristically initiated to sanction the federal plaintiff," meaning, in this case, the Providers. Id. at 592 (quoting Huffman v. Pursue, Ltd. , 420 U.S. 592, 604, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) ). Abstention in such cases reflects "a proper respect for state functions" when the party seeking relief from the federal court "has an adequate remedy at law and will not suffer irreparably [sic] injury if denied equitable relief." Id. at 591 (quoting Younger , 401 U.S. at 43-44, 91 S.Ct. 746 ). We have also defined civil enforcement proceedings as coercive rather than remedial. Brown , 555 F.3d at 890. Though the Supreme Court has disclaimed this distinction "given the susceptibility of the designations to manipulation," Sprint Commc'ns , 134 S.Ct. at 593 n.6, Brown still provides valuable guidance for our analysis.
Under this framework, plaintiffs suing under § 1983 must "exhaust[ ] state administrative remedies only where the state administrative proceedings are coercive." Brown , 555 F.3d at 890. Civil enforcement proceedings are coercive when the state initiates the proceedings and the target of those proceedings challenges them as unlawful in federal court. Id. at 889 ; Sprint Commc'ns , 134 S.Ct. at 592. On the other hand, proceedings are remedial when the federal plaintiff initiates them seeking a remedy for a state-inflicted wrong. Brown , 555 F.3d at 890-91.
We agree with the district court that the administrative proceedings in this case were not civil enforcement actions subject to Younger abstention. Mosier , 2016 WL 3597457, at *13. As the district court pointed out, the Providers chose to participate in an evidentiary hearing on April 29-this hearing was not mandatory. Id. The proceedings that Kansas "initiated to sanction [the Providers]" were completed with the final termination notices-those notices were Kansas's sanctions. Id. (quoting Sprint Commc'ns , 134 S.Ct. at 592 ). After receiving the notices of termination, the Providers took no further action. Nor were they required to do so, because any further appeals would be optional avenues to seek redress for their injuries. In other words, even if Kansas's "administrative termination of the Providers [was] coercive, *1223 intended to sanction the Providers for misconduct," Appellant's Opening Br. at 36, that action was final when the Plaintiffs sued under § 1983. Therefore, any additional administrative proceedings could not be characterized as civil enforcement proceedings, meaning that contrary to Kansas's claims, the Providers faced no exhaustion requirement under these circumstances.[11]
Finally, but importantly, we also note that though the Providers had the right of appeal, the Patients did not. See Mosier, 2016 WL 3597457, at *13 ; see Kliebert , 141 F.Supp.3d at 633. And the Patients are not subject to an exhaustion requirement under § 1983. See Gee , 862 F.3d at 455 ("[T]he Individual Plaintiffs have no administrative appeal rights, and they are not subject to (nor could they be) any administrative exhaustion requirement under 42 U.S.C. § 1983."); Planned Parenthood Se., Inc. v. Bentley , 141 F.Supp.3d 1207, 1215 (M.D. Ala. 2015) ("[T]he Eleventh Circuit, like every other circuit to consider the issue, has concluded that exhaustion is not required for claims under the Medicaid Act."). In sum, the district court did not err in declining to abstain under Younger because the administrative proceedings were not ongoing, and were not the type of proceedings meriting Younger abstention.
III. Preliminary Injunction
We review a district court's preliminary injunction for abuse of discretion. N.M. Dep't of Game & Fish v. U.S. Dep't of Interior , 854 F.3d 1236, 1245 (10th Cir. 2017). "An abuse of discretion occurs where a decision is premised on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." Id. (quoting Fish v. Kobach , 840 F.3d 710, 723 (10th Cir. 2016) ). We will overturn a preliminary injunction order only if it is arbitrary, capricious, whimsical, or manifestly unreasonable. See Pac. Frontier v. Pleasant Grove City , 414 F.3d 1221, 1231 (10th Cir. 2005). We review the district court's factual findings "under the deferential 'clear error' standard." Planned Parenthood Ass'n of Utah v. Herbert , 828 F.3d 1245, 1252 (10th Cir. 2016) (quoting Glossip v. Gross , --- U.S. ----, 135 S.Ct. 2726, 2739, 192 L.Ed.2d 761 (2015) ). We review de novo the district court's legal determinations. Nova Health Sys. v. Edmondson , 460 F.3d 1295, 1299 (10th Cir. 2006).
Preliminary injunctions are extraordinary remedies requiring that the movant's right to relief be clear and unequivocal. Wilderness Workshop v. U.S. Bureau of Land Mgmt. , 531 F.3d 1220, 1224 (10th Cir. 2008). To obtain a preliminary injunction, a plaintiff must show "[ (1) ] that he is likely to succeed on the merits, [ (2) ] that he is likely to suffer irreparable harm in the absence of preliminary relief, [ (3) ] that the balance of equities tips in his favor, and [ (4) ] that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc. , 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).
Before we address the Patients' likelihood of success on the merits, we first decide the threshold issue of whether the Medicaid Act's free-choice-of-provider provision, § 1396a(a)(23), creates a private right of action for the Patients.[12] We then *1224 determine whether the Patients are likely to succeed on the merits of their claim.
A. Private Right of Action Under § 1396a(a)(23)
We are comfortable joining four out of the five circuits that have addressed this issue, and we too hold "that § 1396a(a)(23) affords the [Patients] a private right of action under § 1983." Gee , 862 F.3d at 457[13] ; see also Planned Parenthood of Ariz. Inc. v. Betlach , 727 F.3d 960, 966-68 (9th Cir. 2013), cert. denied , --- U.S. ----, 134 S.Ct. 1283, 188 L.Ed.2d 300 (2014) (reaching the same conclusion); Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health , 699 F.3d 962, 974-75 (7th Cir. 2012), cert. denied , 133 S.Ct. 2736, 133 S. Ct. 2738 (2013) (same); Harris v. Olszewski , 442 F.3d 456, 461-62 (6th Cir. 2006) (same). But see Does v. Gillespie , 867 F.3d 1034, 1041-42 (8th Cir. 2017) (holding in a split decision that § 1396a(a)(23) does not grant Medicaid patients an enforceable right). "Medicaid is a cooperative federal-state program that provides federal funding for state medical services to the poor." Frew ex rel. Frew v. Hawkins , 540 U.S. 431, 433, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004). Medicaid "offers the States a bargain: Congress provides federal funds in exchange for the States' agreement to spend them in accordance with congressionally imposed conditions." Armstrong v. Exceptional Child Ctr., Inc. , --- U.S. ----, 135 S.Ct. 1378, 1382, 191 L.Ed.2d 471 (2015). This means that the federal government will share a state's cost of providing medical care to residents who can't afford it, but only if the state complies with the Medicaid Act's requirements, including "federal criteria governing matters such as who receives care and what services are provided at what cost." Nat'l Fed'n of Indep. Bus. v. Sebelius , 567 U.S. 519, 541-42, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) ; see also Atkins v. Rivera , 477 U.S. 154, 157, 106 S.Ct. 2456, 91 L.Ed.2d 131 (1986) (explaining the federal-state partnership for implementing Medicaid).
As discussed, the statute at issue in this case is the Medicaid Act's free-choice-of-provider provision, 42 U.S.C. § 1396a(a)(23). That provision states:
A state plan for medical assistance must ... provide that (A) any individual eligible for medical assistance ... may obtain *1225 such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required ... who undertakes to provide him such services....
42 U.S.C. § 1396a(a)(23)(A). This section goes on to state that "an enrollment of an individual eligible for medical assistance in a primary care case-management system ..., a medicaid managed care organization, or a similar entity shall not restrict the choice of the qualified person from whom the individual may receive services under section 1396d(a)(4)(C) of this title."[14] Id. at § 1396a(a)(23)(B). Section 1396d(a)(4)(C) specifically grants Medicaid patients the right to choose their provider for family-planning services. See Betlach , 727 F.3d at 964. So, under the free-choice-of-provider provision, "any individual Medicaid recipient is free to choose any provider so long as two criteria are met: (1) the provider is 'qualified to perform the service or services required,' and (2) the provider 'undertakes to provide [the recipient] such services.' " Id. at 967 (quoting 42 U.S.C. § 1396a(a)(23)(A) ).
1. Blessing /Gonzaga Requirements
The question here is whether the free-choice-of-provider agreement creates a private right enforceable under 42 U.S.C. § 1983. To do so, (1) "Congress must have intended that the provision in question benefit the plaintiff," (2) the plaintiff must have "demonstrate[d] that the right assertedly protected ... is not so 'vague and amorphous' that its enforcement would strain judicial competence," and (3) the statute that creates the right must be "couched in mandatory, rather than precatory, terms." Blessing v. Freestone , 520 U.S. 329, 340-41, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) (quoting Wright v. City of Roanoke Redev. & Hous. Auth. , 479 U.S. 418, 431, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987) ). If "the text and structure of a statute provide no indication that Congress intends to create new individual rights," then the § 1983 plaintiff cannot proceed further. Gonzaga Univ. v. Doe , 536 U.S. 273, 286, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). But if the plaintiff satisfies the three Blessing requirements, "the right is presumptively enforceable" under § 1983. Id. at 284, 122 S.Ct. 2268. Still, defendants can rebut this presumption by showing that Congress either expressly foreclosed private enforcement, or impliedly did so "by creating a comprehensive enforcement scheme that is incompatible with" private enforcement. Id. at 284 & n.4, 122 S.Ct. 2268 (quoting Blessing , 520 U.S. at 341, 117 S.Ct. 1353 ).
a. Congress Intended to Benefit Medicaid Patients
As have the Fifth, Sixth, Seventh, and Ninth Circuits, we conclude that the free-choice-of-provider provision confers on Medicaid patients a private right of action. See Gee , 862 F.3d at 457 ; Comm'r of Ind. , 699 F.3d at 974-75 ; Betlach , 727 F.3d at 966-68 ; Olszewski , 442 F.3d at 461-62. But see Gillespie , 867 F.3d at 1046. First, we have no trouble concluding that Congress unambiguously intended to confer an individual right on Medicaid-eligible patients. See Betlach , 727 F.3d at 966. "The statutory language unambiguously confers such a right," because it mandates that "all state Medicaid plans provide that 'any individual eligible for medical assistance ... may *1226 obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required.' " Id. (omission in original) (emphasis omitted) (quoting 42 U.S.C. § 1396a(a)(23) ). Further, " Section 1396a(a)(23)(B)... carves out and insulates family planning services from limits that may otherwise apply under approved state Medicaid plans, assuring covered patients an unfettered choice of provider for family planning services." Id. at 964 (citing §§ 1396a(a)(23)(B), 1396d(a)(4)(C) ). Congress has therefore clearly intended to grant a specific class of beneficiaries-Medicaid-eligible patients-an enforceable right to obtain medical services from the qualified provider of their choice.
Kansas also claims that Armstrong supports its claim that the free-choice-of-provider provision does not confer on the Patients an enforceable right because in it, Justice Scalia opined that Spending Clause legislation does not provide a private right of action. 135 S.Ct. at 1387. But in Armstrong , the Supreme Court analyzed an entirely different section of the Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A), concluding that this specific section did not create a private right of action. Id. Section 1396a(a)(30)(A) provides that "[a] State plan for medical assistance must ... provide such methods and procedures relating to the utilization of, and the payment for" Medicaid services to ensure that Medicaid pays for only necessary, efficient, economic, and high-quality care while still setting reimbursement rates high enough to encourage providers to continue serving Medicaid patients. In his opinion, the last portion of which Justice Breyer declined to join, thus making that portion a plurality, Justice Scalia stated that "Section 30(A) lacks the sort of rights-creating language needed to imply a private right of action." Id. But the plaintiffs there did not sue under § 1983 to enforce a right established by the Medicaid Act. Id. ("The last possible source of a cause of action for respondents is the Medicaid Act itself. They do not claim that, and rightly so.").
Unlike § 1396a(a)(23), which provides that "any individual eligible for medical assistance ... may obtain such assistance from any [provider] ... qualified to perform the service or services required," the Medicaid Act section at issue in Armstrong directed states to adopt rate-setting plans in accordance with certain general standards. The free-choice-of-provider provision, "[i]n contrast [to Armstrong 's Medicaid Act section,] § 1396a(a)(23)... is phrased in individual terms that are specific and judicially administrable, as recognized by the Sixth, Seventh, and Ninth Circuits." Gee , 862 F.3d at 462. Justice Scalia also noted in Armstrong that the plaintiffs were providers, as opposed to the providers' patients, who are the Medicaid Act's intended beneficiaries. 135 S.Ct. at 1387. As such, he doubted "that providers are intended beneficiaries (as opposed to mere incidental beneficiaries) of the Medicaid agreement." Id. Indeed, the majority speculated that the provider-plaintiffs in Armstrong likely chose not to sue under § 1983 because they had no unambiguously conferred right under Gonzaga . Id. at 1386 n.*. So Armstrong does nothing to undermine the Patients' claim that Congress intended to confer on them an enforceable right of action with the free-choice-of-provider provision.
b. Right Not Vague or Amorphous
Second, the free-choice-of-provider agreement is not so " 'vague and amorphous' that its enforcement would strain judicial competence." Blessing , 520 U.S. at 340-41, 117 S.Ct. 1353 (1997) (quoting Wright , 479 U.S. at 431, 107 S.Ct. 766 ). Kansas contends that the term "qualified" makes the free-choice-of-provider provision judicially unadministrable because it *1227 is neither defined in the Medicaid Act, nor self-defining. Appellant's Opening Br. at 41. This position is at odds with four of the five circuits that have decided the issue. See Gee , 862 F.3d at 457-58 ; Betlach , 727 F.3d at 967-68 ; Comm'r of Ind. , 699 F.3d at 974 ; Olszewski , 442 F.3d at 462 ; see also Gillespie , 867 F.3d at 1050 (Melloy, J., dissenting) (agreeing that the right conferred by the freedom-of-choice provision is not so vague and amorphous that it would strain judicial competence). We agree with the reasoning expressed by these four circuits.
Under the Medicaid Act, plaintiffs need show only that their provider of choice was (1) qualified to perform the medical services, and (2) undertaking to do so. See 42 U.S.C. § 1396a(a)(23). These requirements are " 'concrete and objective standards for enforcement,' which are 'well within judicial competence to apply.' " Gee , 862 F.3d at 459 (quoting Betlach , 727 F.3d at 967 ). As the Ninth Circuit held and the Fifth Circuit has reiterated, "courts addressing this provision confront 'a simple factual question no different from those courts decide every day,' " which requires no "balancing of competing concerns or subjective policy judgments." Id. (quoting Betlach , 727 F.3d at 967 ).
"[W]hile there may be legitimate debates about the medical care covered by or exempted from the [free-choice-of-provider] provision," the definition of the word "qualified" cannot be legitimately debated. Olszewski , 442 F.3d at 462. Though determining whether a provider is qualified "may require more factual development or expert input, [it] still falls well within the range of judicial competence." Betlach , 727 F.3d at 967. Whether a provider was qualified to perform medical services and undertaking to do so "is 'likely to be readily apparent.' " Id. (quoting Olszewski , 442 F.3d at 462 ).
Kansas again relies heavily on Armstrong to support its claim that § 1396a(a)(23) is judicially unadministrable. It claims that "determining whether a provider is 'qualified' is a [sic] dependent upon judgment, industry experience, and technical expertise," and that such a determination implicates "expert judgments and questions of state law." Appellant's Opening Br. at 41. But in making this claim, Kansas compares the free-choice-of-provider provision's willing-and-qualified requirements to the requirements contained in § 1396a(a)(30)(A) of the Medicaid Act, which was at issue in Armstrong . That section requires state plans to "provide for payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of ... care and services.' " Armstrong , 135 S.Ct. at 1385 (alterations in original) (quoting 42 U.S.C. § 1396a(a)(30)(A) ).
Compared to that "judgment-laden standard," id. , the decision of whether a provider is qualified is much simpler. Indeed, "the statutory term here, 'qualified,' is tethered to an objective benchmark: 'qualified to perform the service or services required .' " Betlach , 727 F.3d at 967-68 (quoting 42 U.S.C. § 1396a(a)(23)(A) ). Courts can determine whether providers are qualified by "drawing on evidence such as descriptions of the service required; state licensing requirements; the provider's credentials, licenses, and experience; and expert testimony regarding the appropriate credentials for providing the service." Id. at 968. This analysis is "no different from the sorts of qualification or expertise assessments that courts routinely make." Id.
c. Right Stated in Mandatory Terms
On the third element, we conclude that the statute is "couched in mandatory, rather *1228 than precatory, terms." Blessing , 520 U.S. at 341, 117 S.Ct. 1353. Kansas doesn't contest this prong of the Blessing / Gonzaga analysis, nor could it. The statute provides that "[a] State plan for medical assistance must " allow Medicaid-eligible individuals to obtain medical services from the qualified provider of their choice. 42 U.S.C. § 1396a(a)(23)(A) (emphasis added). The statute confers a private right on Medicaid-eligible individuals; it is not merely "a directive to the federal agency." Armstrong , 135 S.Ct. at 1387 ; see Gee , 862 F.3d at 461 ; Betlach , 727 F.3d at 967 ; Comm'r of Ind. , 699 F.3d at 974 ; Olszewski , 442 F.3d at 462. But see Gillespie , 867 F.3d at 1041. Rather, it affirmatively requires state plans to allow Medicaid-eligible people to obtain medical services from their willing and qualified provider of choice.
2. Congressional Intent to Foreclose Private Enforcement
Still, even if a plaintiff meets these three threshold requirements, the plaintiff has established "only a rebuttable presumption that the right is enforceable under § 1983." City of Rancho Palos Verdes v. Abrams , 544 U.S. 113, 120, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005) (quoting Blessing , 520 U.S. at 341, 117 S.Ct. 1353 ). "The defendant may defeat this presumption by demonstrating that Congress did not intend that remedy for a newly created right." Id. The statute creating the right may contain evidence of such congressional intent; otherwise, we may infer it if the statute contains a "comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." Id. (quoting Blessing , 520 U.S. at 341, 117 S.Ct. 1353 ).[15]
Here, again, Kansas relies on Armstrong to support its claim. There, the providers sued Idaho, claiming that it had violated § 1396a(a)(30)(A) by reimbursing them at rates lower than the Medicaid Act permitted. Armstrong , 135 S.Ct. at 1382. The providers asserted "an implied right of action under the Supremacy Clause to seek injunctive relief against the enforcement or implementation of state legislation." Id. at 1383 (quoting Exceptional Child Ctr., Inc. v. Armstrong , 567 Fed.Appx. 496, 497 (9th Cir. 2014) (unpublished), rev'd , Armstrong , 135 S.Ct. 1378 ). Justice Scalia stated that "Spending Clause legislation like Medicaid" doesn't confer a private right of action because the "sole remedy Congress provided for a State's failure to comply with Medicaid's requirements ... is the withholding of Medicaid funds by the [federal] Secretary of Health and Human Services." Id. at 1385, 1387.
*1229 But Armstrong isn't a § 1983 case. Plus, an earlier Supreme Court case, Wilder v. Virginia Hospital Ass'n , 496 U.S. 498, 522, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), had previously rejected Kansas's argument. Wilder held that "[the Medicaid Act's] administrative scheme cannot be considered sufficiently comprehensive to demonstrate a congressional intent to withdraw the private remedy of § 1983.... '[G]eneralized powers' ... to audit and cut off federal funds [are] insufficient to foreclose reliance on § 1983 to vindicate federal rights."[16] 496 U.S. at 522, 110 S.Ct. 2510 (quoting Wright , 479 U.S. at 428, 107 S.Ct. 766 ). And because Justice Kennedy didn't join Justice Scalia's Spending Clause reasoning, it is not binding on us; Wilder still is. Moreover, Armstrong 's analysis of a state's violation of the Medicaid Act is inapplicable to the Patients' claim that Kansas is attempting to deprive them of their right to receive medical services from their chosen, qualified providers, because the federal Secretary's withholding Medicaid funds would not redress their injuries at all. Unlike the plaintiffs in Armstrong , who were providers, the Patients here are individual beneficiaries of the Medicaid Act; and unlike in Armstrong , they are not merely contesting reimbursement rates, they are asserting that the state has violated their substantive right to receive medical care from their chosen medical providers. Also importantly, the providers in Armstrong asserted a right of action under a Medicaid Act rate-setting provision and the Supremacy Clause, unlike the Patients here, who assert their right under § 1983 and the Medicaid Act's free-choice-of-provider provision.
Even if § 1396a(a)(30)(A) could fairly be read to display congressional intent to foreclose the availability of equitable relief, id. at 1386, § 1396a(a)(23) -the free-choice-of-provider provision-can't be read that way.
B. Preliminary Injunction Factors
1. Likelihood of Success on the Merits
Having concluded that the free-choice-of-provider provision confers on the Patients a private right of action, we now turn to the first and most important preliminary-injunction factor: whether the Patients are likely to succeed on the merits.
Again, § 1396(a)(23) requires a state plan to provide that "any individual eligible *1230 for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required ... who undertakes to provide him such services[.]" In evaluating what it means for a provider to be "qualified to provide services," we agree with the district court and "the Seventh and Ninth Circuits, [that] '[t]o be 'qualified' in the relevant sense is to be capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." Gee , 862 F.3d at 462 (quoting Comm'r of Ind ., 699 F.3d at 978 ); see also Betlach , 727 F.3d at 969 (concluding that qualified means "having an officially recognized qualification to practice as a member of a particular profession; fit, competent" (quoting Oxford English Dictionary (3d ed. 2007) ) ). In the district court, Kansas did not contest this meaning of the term "qualified." Mosier , 2016 WL 3597457, at *17.
All agree that states have considerable discretion in establishing provider qualifications. See 42 C.F.R. § 431.51(c)(2) (stating that a recipient's right to the services of any provider qualified and willing to perform the services does not prohibit states from "[s]etting reasonable standards relating to the qualifications of providers"). But that authority entitles Kansas to set qualifications only for professional competency and patient care. See Betlach , 727 F.3d at 970 (declaring that states are not free to define "qualified" however they wish for their own purposes). We agree with the district court that the Plaintiffs may assert that they were denied their right to receive Medicaid services from the willing and qualified provider of their choice because their provider was wrongfully removed from the pool of providers.[17] Mosier , 2016 WL 3597457, at *18.
The Plaintiffs must be allowed to challenge PPGP's termination. After all, if a state wrongly terminates a provider-whether on grounds raised by Kansas under § 1320a-f(b)(5)(B) or f(b)(12)(B) or otherwise-it will have wrongly removed a qualified provider from the available pool. If a state could terminate providers without any challenge by affected patients, the patients' § 1396a(a)(23) right would lose force and be easily eviscerated. We agree with the district court that when Kansas shrinks the pool of qualified providers by terminating them under § 1396a(p)(1), patients must have a § 1396a(a)(23) right to challenge the state's termination decision as improper or wrongful. Mosier , 2016 WL 3597457, at *17.
Kansas takes a different view. It argues that termination decisions under § 1396a(p)(1) (which references § 1320a-7(b) ) are separate from the right of patients to any qualified and willing provider under § 1396a(a)(23). In effect, Kansas argues that patients have no right to services from qualified providers whom it has terminated.
We agree that states have broad powers to terminate Medicaid providers. After all, § 1396a(p)(1)"empowers states to exclude individual providers on such grounds directly, without waiting for the [federal] Secretary to act, while also reaffirming state authority to exclude individual providers pursuant to analogous state law provisions relating to fraud or misconduct." Betlach , 727 F.3d at 972. These grounds include a wide swath of misconduct set out in federal law-including *1231 fraud, drug crimes, obstructing investigations, license revocations, federal or state sanctions, and certain felony convictions. They also include violations of "state laws concerning health and safety, and federal regulations expressly permit States to establish 'reasonable standards relating to the qualifications of providers.' " Appellant's Brief at 48 (quoting 42 C.F.R. § 431.51(c)(2) ). But these provisions do not make the state's termination decision unchallengeable. Patients must have a right to challenge termination decisions to protect themselves against wrongful deprivation of access to qualified and willing providers, that is, to protect their guaranteed right expressly given by § 1396a(a)(23). In short, § 1396a(a)(23) confers the right and cabins the state's authority under § 1396a(p)(1), such that patients can challenge the termination decisions.
In support of its view that termination decisions under § 1396a(p)(1) are final and beyond patients' ability to challenge under § 1396a(a)(23), Kansas relies in part on O'Bannon v. Town Court Nursing Center , 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980). Kansas argues that "the free-choice-of-provider provision entitles beneficiaries only to 'the right to choose among a range of qualified providers , without government interference.' " Appellant's Opening Br. at 46 (quoting O'Bannon , 447 U.S. at 785, 100 S.Ct. 2467 ). But O'Bannon addressed a different situation-one where no one contested that the nursing home was unqualified to perform the services. We agree that § 1396a(a)(23)"clearly does not confer a right on a recipient to enter an unqualified home and demand a hearing to certify it, nor does it confer a right on a recipient to continue to receive benefits for care in a home that has been decertified." 447 U.S. at 785, 100 S.Ct. 2467. But unlike in O'Bannon , the Providers in the case before us remained qualified to perform the medical services.
In addition, we note that the nursing home residents in O'Bannon asserted procedural due-process rights, not substantive rights, as the patients do here. See Gee , 862 F.3d at 460. But see Gillespie , 867 F.3d at 1048 (Shepherd, J., concurring).[18] And in O'Bannon , the patients didn't contest that the nursing home's decertification had resulted from the home's failure to provide adequate medical, physical, nursing, and pharmaceutical services, as well as its failure to maintain adequate records and an adequate system of governance. 447 U.S. at 776 n.3, 100 S.Ct. 2467. Rather, the elderly Medicaid patients stressed the harm they would suffer if their nursing home closed and they were forced to move. Id. at 777, 100 S.Ct. 2467. So the Supreme Court's holding concerned whether Medicaid recipients were entitled to a hearing to continue receiving care from an unqualified, *1232 decertified provider. Id. at 786, 100 S.Ct. 2467 ("[W]hile a patient has a right to continued benefits to pay for care in the qualified institution of his choice, he has no enforceable expectation of continued benefits to pay for care in an institution that has been determined to be unqualified."). Here, the Patients are not challenging the right to continue receiving care from an unqualified provider. Instead, they contend Kansas wrongfully terminated the Providers, thereby infringing their choice-of-provider rights. For this reason, we disagree with Kansas that O'Bannon controls this case in Kansas's favor.
a. Waste Inspections
The state first claims that PPGP's Overland Park clinic violated Kansas law by hindering the state's investigation of its waste-disposal practices. See Kan. Admin. Regs. § 28-29-16(a)(1) (authorizing Kansas BWM employees to enter and inspect premises dealing with solid waste and to gather information about conditions and procedures); Kan. Stat. Ann. §§ 65-3409(a)(6), 65-3401 (declaring it unlawful to refuse to permit or hinder waste-disposal investigations, including examination and copying records).
Specifically, Kansas argues that the clinic violated the Medicaid Act by failing "to grant immediate access" to the Kansas BWM employees who investigated the clinic's waste-disposal practices. 42 U.S.C. § 1320a-7(b)(12)(B). "Failure to grant immediate access means the failure to grant access at the time of a reasonable request or to provide a compelling reason why access may not be granted." 42 C.F.R. § 1001.1301(a)(2). But § 1320a-7(b)(12)(B) allows states to terminate providers who refuse to grant immediate access to state employees conducting reviews under, in relevant part, § 1396a(a)(33). And § 1396a(a)(33)(A) requires states to establish plans to have "appropriate professional health personnel" review "the appropriateness and quality of care and services furnished to" Medicaid recipients.
We agree with the district court that the Plaintiffs are likely to succeed in proving "that they did grant immediate access to the inspectors," as well as "that the solid waste inspection here d[id] not constitute a review bearing on" the quality of care the Providers furnished to Medicaid recipients. Mosier , 2016 WL 3597457, at *20. The Providers presented sufficient evidence that PPGP employees at the Overland Park clinic accommodated BWM investigators' unannounced arrival at the clinic by inviting them to conduct their inspection, but asking them not to take photographs while patients were present. The inspectors chose to leave instead. And while initially withholding the list of the clinic's waste-services vendors, PPGP provided that information after assuring its confidentiality would be protected.
Even if this conduct could be labeled a "[f]ailure to grant immediate access" to Kansas officials, which is doubtful, clinic employees "provide[d] a compelling reason" for their refusal to allow photographs or to turn over its vendor list: they were concerned for patient safety and privacy. 42 C.F.R. § 1001.1301(a)(2). Notably, Kansas never cited PPGP for allegedly impeding the inspection. Mosier , 2016 WL 3597457, at *21. And despite Kansas's claim that PPGP's "providing some access to its facility nearly a month after the inspection was initiated, along with its opportunity to fix any problems, hardly satisfied the 'immediate access' requirement of federal law," Appellant's Opening Br. at 50, the record shows that when the state's investigators first visited the clinic, PPGP employees granted them complete access to the clinic and invited them to complete a visual inspection. And Kansas points to no law that would require a medical provider to permit photographs to be taken of its *1233 operations while patients are present and being served.
As its second basis for termination, Kansas relies on § 1320a-7(b)(5)(B). That provision allows the Secretary to terminate any individual or entity "for reasons bearing on the individual's or entity's professional competence, professional performance, or financial integrity." We agree with the district court "that PPKM's [now PPGP's] purported failure to cooperate with the BWM's solid waste inspection in December 2015 does not bear on PPKM's [PPGP's] 'professional competence, professional performance, or financial integrity.' " Mosier , 2016 WL 3597457, at *19. As the district court found, "it is undisputed that no solid waste violations were found, so the only basis for termination associated with the inspection was the alleged failure to cooperate." Id . We agree that Kansas has not explained how this purported failure to cooperate would bear on PPGP's professional competence, professional performance, or financial integrity. Id . In its brief, Kansas references § 1320a-7(b)(5)(B) just twice, first simply citing its standard, and second, saying that the Providers showed a lack of "professional competence" in "refusing to allow public health inspectors to do their job[.]" Appellant's Brief at 48, 54. And Kansas's reply brief does even less, failing even to cite § 1320a-7(b)(5)(B).
The Dissent
The dissent does not contend that Kansas is entitled to prevail on § 1320a-7(b)(12)(B) or (b)(5)(B). As grounds authorizing termination, the dissent instead relies on a neighboring section unmentioned by Kansas in its brief- 42 U.S.C. § 1320a-7(b)(12)(C). Dissent at 1245. In fashioning a new argument, the dissent steps beyond our usual practice. See Modoc Lassen Indian Hous. Auth. v. UnitedStates Dep't of Hous. & Urban Dev , No. 14-1313, 881 F.3d 1181, 1194-96 n. 9, 2017 WL 7369692, at *10 n.9 (10th Cir. Dec. 22, 2017) (declining to consider an argument unraised by the parties). In response to the dissent, we discuss why the dissent's cited statutory provision fails to provide Kansas a basis for termination. We will not decide an argument that Kansas failed to raise in the district court or on appeal.
That said, in responding to the dissent's argument, we turn to § 1320a-7(b)(12)(C) which reads as follows:
(12) Failure to grant immediate access. Any individual or entity that fails to grant immediate access, upon reasonable request (as defined by the [HHS] Secretary in regulations) to any of the following:
* * *
(C) To the Inspector General of the Department of Health and Human Services, for the purpose of reviewing records, documents, and other data necessary to the performance of the statutory functions of the Inspector General.
The dissent argues that Kan. Reg. § 28-29-16(a)(1) is analogous to this federal statute subsection, authorizing Kansas to terminate the Providers' contracts based on its regulation. The dissent relies on this portion of the state regulation:
The [Kansas Secretary of Health and Environment] or any duly authorized representative of the secretary, at any reasonable hour of the day, having identified themselves and giving notice of their purpose, may ... [e]nter ... any environment where solid wastes are generated, stored, handled, processed, or disposed, and inspect the premises and gather information of existing conditions and procedures....
Dissent at 1245-46.
The dissent ignores an applicable federal regulation bearing on inspections, which allows OIG immediate access on reasonable *1234 request to review "records, documents and other materials or data ... necessary to the [performance of the Inspector General's] statutory functions[.]" 42 C.F.R. § 1001.1301(a)(1)(iii). But in defining "failure to grant immediate access," the federal regulation requires that a provider have 24 hours to provide compelling evidence why the records cannot be produced, except on OIG's reasonable belief of imminent alteration or destruction of the records (and Kansas has not alleged that it had such a belief). 42 C.F.R. § 1001.1301(a)(3)(i). And as a "reasonable request" the regulation requires a written request for documents signed by a designated representative of OIG "where there is information to suggest that the [individual or entity] has violated statutory or regulatory requirements under Titles V, XI, XVIII, XIX or XX of the Act." 42 C.F.R. § 1301(a)(3)(ii). Further, the regulation requires that the agency request include these definitions and advise the individual or entity of the length of exclusion for failure to comply with the request. 42 C.F.R. § 1001.1301(a)(3), (b). In short, the federal regulation provides considerably more protections to a provider. In this circumstance, the state regulation is not analogous to federal law.
So we reject the view that Kansas was entitled to terminate PPGP on the dissent's independently raised ground. In doing so, we also rely on the district court's reasoning when it rejected Kansas's reliance on § 1320a-7(b)(12)(B) -namely, that PPGP was willing to let the inspection continue absent photographs (having confidentiality concerns), that the Kansas regulation did not provide for photography, and that PPGP willingly released the vendor lists after negotiating a confidentiality agreement with the inspecting agency. See Mosier , 2016 WL 3597457, at *19.
b. CMP Videos of Fetal Tissue Negotiation
Kansas next argues that it was entitled to terminate PPGP's and PPSLR's provider agreements because "PPFA's affiliates" violated federal and state law prohibiting the for-profit sale of human body parts and fetal tissue. Id. at 51 (citing 42 U.S.C. §§ 274e, 289g-2 ; Kan. Stat. Ann. § 65-6704 ). Importantly, Kansas doesn't claim that PPGP or PPSLR engaged in such illegal conduct; rather, it claims that "[e]ven if these activities were conducted by PPFA, ... the Medicaid Act permits the State to terminate its provider agreement based on those activities or the entity's unlawful or unethical activities in other States." Id. at 51-52 (citing 42 U.S.C. §§ 1320a-7(a)(3), (a)(1), (b)(1)(A)(ii) ). According to Kansas, "providers must be terminated from participation in 'any Federal health care program'-no matter where that program is administered-if they commit certain felony offenses in connection with a health care program administered by 'any Federal, State, or local government agency.' " Id. (quoting 42 U.S.C. § 1320a-7(a)(3) ).
But, first, all of the termination provisions Kansas relies on require a criminal conviction or related sanction; and no PPFA affiliate, including PPGP and PPSLR, has been convicted or sanctioned for any wrongdoing. And the district court rightly explained that even if PPFA had negotiated the illegal sale of fetal body parts (and this allegation has never been proved), "under [ § 1396a(p)(1) ], the 'entity' that a 'State may exclude' must be the same entity that committed the infraction defined in § 1320a-7(b)." Mosier , 2016 WL 3597457, at *18. Indeed, the sole provision allowing termination on the basis of affiliation applies exclusively to entities controlled by a sanctioned individual and mandates that the sanctioned individual must *1235 have ownership interest or control over the affiliated entity. 42 U.S.C. § 1320a-7(b)(8). Thus, if the statute allows a state to exclude a provider based on its affiliation with a different provider, the affiliation must involve ownership or control. See Bentley , 141 F.Supp.3d at 1223-24 & n.9.
Kansas never addresses the district court's conclusion, instead arguing that PPGP and PPSLR never established that they were separate and independent from PPFA. We agree with the district court that the Providers are not sufficiently affiliated with PPFA so that Kansas can attribute this alleged conduct to them under the law. See Mosier , 2016 WL 3597457, at *21. Kansas states that PPFA's affiliates aggregate their finances, share executives, and share legal counsel. Kansas also states that PPFA establishes and imposes medical and ethical policies on its affiliates.
But these factors do nothing to show that PPFA exercises control over its affiliates' daily operations. In fact, because many PPFA affiliates don't offer abortions-and Kansas provides nothing to show that PPFA could or would require them to do so-we cannot attribute PPFA's alleged abortion-related conduct to PPFA affiliates absent evidence that specifically implicates the affiliates.[19] See Gee , 862 F.3d at 450. Kansas discusses when courts treat two corporate entities as one, but it presents no authority to support its argument that "one corporation can be held responsible for the policies of an umbrella organization regarding a practice that other affiliated corporations engage in." Bentley , 141 F.Supp.3d at 1224 n.10.
In sum, the Plaintiffs are likely to succeed in proving that Kansas cannot terminate PPGP from the state's Medicaid program for PPFA's alleged unlawful conduct.
c. Medicaid Fraud by PPFA Affiliates
Last, Kansas claims it was justified in terminating PPGP and PPSLR in light of allegations that other PPFA affiliates had committed Medicaid fraud. Kansas claims that the numerous allegations of Medicaid fraud by Planned Parenthood affiliates around the country provide relevant evidence of PPGP's and PPSLR's "questionable billing practices." Appellant's Opening Br. at 8-9. This argument fails for the same reason the previous argument fails. Kansas never alleged that PPGP or PPSLR engaged in fraud, but it claims that because PPGP merged with Planned Parenthood of Central Oklahoma ("PPCO"), "the new combined entity has necessarily inherited PPCO's record of fraud." Id. at 54. But this "merger" doesn't have the effect that Kansas desires it to.
First, the only thing this "merger" changed was PPGP's name: the former PPKM now operates under the name "Planned Parenthood Great Plains." Appellant's App. at 828. The merger resulted in "no change of ownership or management structure" for PPGP. Id. Second, though Oklahoma Governor Mary Fallin cited two "integrity reviews" finding error rates in billing of 20.3% and 14.1% in calling for PPCO's termination from Oklahoma's Medicaid plan, id. at 417-19, Kansas presented no evidence that Oklahoma had sanctioned or terminated PPCO, and *1236 PPCO is still an Oklahoma Medicaid provider. Third, Kansas cites nothing to support its claim that one corporate entity can inherit another's "record of fraud," even when the two entities merge into a single entity (which does not appear to have happened here).
After considering all of Kansas's bases for terminating PPGP from its state Medicaid plan as unqualified, we conclude that, as in Gee , Commissioner of Indiana , and Betlach , Kansas "is seeking to do exactly what [other circuits] warned against: 'simply labeling any exclusionary rule as a "qualification" ' to evade the mandate of the free-choice-of-provider requirement." Gee , 862 F.3d at 469 (quoting Comm'r of Ind. , 699 F.3d at 978 ). "[T]he free-choice-of-provider provision unambiguously requires that states participating in the Medicaid program allow covered patients to choose among the family planning medical practitioners they could use were they paying out of their own pockets." Betlach , 727 F.3d at 971. Because Kansas has not otherwise sanctioned or charged PPGP for any wrongdoing, allowing the state to terminate PPGP from its Medicaid program would cause exactly this result. We therefore conclude that the district court did not abuse its discretion in finding that Plaintiffs are likely to succeed on the merits of their claim, and we move on to the remaining preliminary-injunction factors.
2. Irreparable Harm
We next consider whether the Patients have shown that they would suffer irreparable harm absent injunctive relief.[20] Irreparable harm is "certain, great, actual 'and not theoretical.' " Heideman v. S. Salt Lake City , 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting Wis. Gas Co. v. FERC , 758 F.2d 669, 674 (D.C. Cir. 1985) ). The district court found that the Patients had met their burden because they would lose medical treatment from the qualified providers of their choice if Kansas's terminations of the Providers were allowed to stand. Mosier , 2016 WL 3597457, at *23. "A disruption or denial of these patients' health care cannot be undone after a trial on the merits." Id.
Kansas argues that the Patients' injuries are speculative for the same reason it contested the Plaintiffs' standing and the case's ripeness: that the administrative appeal is still pending, meaning the state can't terminate the providers until that process is complete or the time period for appeal has expired.[21] See GreaterYellowstone Coal. v. Flowers , 321 F.3d 1250, 1260 (10th Cir. 2003). It also reiterates its argument that "[PPGP's] [state Medicaid] contracts are not subject to immediate termination." Appellant's Opening Br. at 56.
We reject that argument here for the same reason we did above. Only the Providers have a right-not an obligation-to appeal Kansas's decision; the Patients do not. And the Providers have declared that they will not pursue administrative appeal. Mosier , 2016 WL 3597457, at *24. Absent injunctive relief, the state would have stopped reimbursing the PPGP for the Patients' care sometime between July 7, 2016 (Kansas's self-proclaimed termination date) and September 10, 2016 (the date that accounts for the allegedly required *1237 exhaustion period and the alleged contractual delays that apply only to PPGP). Even if the effective date had been two months away, it would not change our conclusion that the Patients were "likely to suffer irreparable harm before a decision on the merits can be rendered." Greater Yellowstone Coal. , 321 F.3d at 1260.
Last, Kansas argues that the Patients would not be injured because the Providers "were conspicuously non-committal about whether termination would even force them to stop seeing the [Patients]," and that the Patients "alleged only that they will not have access to their preferred provider and (at worst) are unsure where else they might receive care." Appellant's Opening Br. at 58-59 & n.13. First, because the Patients all qualify for Medicaid, we cannot disagree with the district court, which "easily [found] that these patients will be unable to afford to pay out of pocket to see the health care provider of their choice without Medicaid assistance." Mosier , 2016 WL 3597457, at *23. Second, "[t]his argument misses the mark. That a range of qualified providers remains available is beside the point." Comm'r of Ind. , 699 F.3d at 981. Section 1396a(a)(23) gives the Patients the exact right they seek to enforce: to obtain medical care from their preferred qualified provider, not to obtain family-planning services from any qualified provider. The Patients have given uncontroverted evidence explaining why they prefer PPGP, including quality of care, lack of bias, and scheduling convenience. Mosier , 2016 WL 3597457, at *23. At least four of the Providers' clinics are located in areas with shortages of primary-care providers. And the district court also rightly rejected Kansas's claims that Patients had plenty of other family-planning-services providers to choose from, finding that the state's evidence on this point was exaggerated. See id.
The district court did not abuse its discretion in concluding that the Patients would suffer irreparable harm absent entry of a preliminary injunction enjoining Kansas from terminating PPGP as a provider.
3. Balance of Harms & Public Interest
We address the last two preliminary-injunction factors together. The final steps in assessing a preliminary injunction's propriety require us to ask whether the balance of equities tips in the Plaintiffs' favor, and whether an injunction is in the public interest. Winter , 555 U.S. at 20, 129 S.Ct. 365. Based on its findings that the three allegations against the Providers were either unfounded or unrelated to the Providers' qualifications, the district court found that "the risk of taxpayer harm is quite low as compared to the certain injury to Medicaid patients if the injunction does not issue." Mosier , 2016 WL 3597457, at *24. Similarly, because the district court found that there was no ongoing administrative proceeding, it concluded that issuing a preliminary injunction and allowing the Plaintiffs to vindicate their Medicaid-Act rights by pursuing their § 1983 claim in federal court would serve the public interest, despite the availability of state administrative remedies. Id. at *25.
On appeal, neither Kansas nor the Plaintiffs addressed this step in the analysis. Either way, we agree with the district court's thorough, reasoned analysis concerning PPGP. The court did not err in concluding that the Plaintiffs have met their burden on this point as well.
Thus, the district court did not abuse its discretion in finding that Plaintiffs have satisfied all of the elements required for entry of a preliminary injunction on the Patients' free-choice-of-provider claim concerning PPGP.
*1238 CONCLUSION
For the reasons stated above, as relates to PPGP, we AFFIRM the district court's order granting the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, thus restraining Kansas from terminating PPGP's Medicaid-provider agreement. And as relates to PPSLR, we VACATE the district court's order, because we conclude that the Patients have not met standing requirements-they have not alleged that they receive medical care at PPSLR. We remand for the district court to determine whether PPSLR itself has sufficiently alleged standing to proceed and whether it is entitled to a preliminary injunction.

Planned Parenthood of Central Oklahoma merged into Planned Parenthood of Kansas and Mid-Missouri ("PPKM"), effective July 1, 2016. As a result, PPKM changed its name to Planned Parenthood Great Plains. In this opinion, we refer to that entity by its new name, PPGP. When we refer to both of these providers collectively, we refer to them as "the Providers."

Though PPSLR's standing might not turn on whether it has a private right of action under the free-choice-of-provider provision, its likelihood of success on the merits may. See Lexmark Intern., Inc. v. Static Control Components, Inc. , --- U.S. ----, 134 S.Ct. 1377, 1386-88 & n.4, 188 L.Ed.2d 392 (2014) ; Safe Streets All. v. Hickenlooper , 859 F.3d 865, 887 (10th Cir. 2017) (discussing footnote 4 of Lexmark and whether "statutory standing" after Lexmark must be understood as a failure to state a claim).

Though we only decide that the district court did not abuse its discretion in enjoining the termination of PPGP, we state the facts pertaining to both Providers to place our analysis in context.

Kansas also terminated eleven individual PPGP and PPSLR employees as Medicaid providers, but rescinded those terminations on June 13, 2016.

The district court concluded that the Patients had standing to pursue their claim, so it declined to resolve whether the Providers also independently had standing. Mosier , 2016 WL 3597457, at *17.

PPSLR has no such contracts with Kansas, so this thirty-day delay doesn't protect PPSLR's patients. Mosier , 2016 WL 3597457, at *24. And the district court found that this additional thirty-day extension for PPGP was questionable. Id. PPGP has contracts with three Managed Care Organizations ("MCO") in Kansas. Id. at *2. Kansas submitted a sample MCO contract that included the thirty-day extension, but the contract in place between Kansas and PPGP when the Plaintiffs sued did not contain the extension, and instead provided for immediate termination.

After the parties had their evidentiary hearing on April 29, Kansas notified the Providers that they would be terminated effective May 10. It told the Providers that if they disagreed with this decision, they had the right to-but did not have to-request a fair hearing before the OAH within thirty-three days of the date on the notice. That date would have been June 6. So, if the Providers hadn't filed their lawsuit in federal court before May 10, they would have been terminated on May 10, subject to possibly obtaining a reversal of the termination in later proceedings. Nothing in the termination notice states that the termination would toll if the Providers requested a fair hearing before the OAH. Instead, Kansas states without support that the Providers' funding would not have terminated on the effective termination date (May 10). But the Providers' termination from Kansas's Medicaid Program would have triggered the loss of Medicaid funding within a few weeks. See Mosier , 2016 WL 3597457, at *8. In fact, Kansas's regulations state that even if the Providers had requested a hearing before the OAH, their Medicaid funding would be terminated pending the appeal's resolution because the request would concern "the termination of a provider from program participation." Kan. Admin. Regs. § 30-7-66(a)(1).

The termination letters provided an effective date of May 10 (later extended to July 7), and advised the Providers that to contest the termination, they could request a fair hearing before the OAH within thirty-three days of the notice. Thus, the letters say that absent appeal, the terminations would be effective even before the Providers' time in which to appeal had expired. So, under the state administrative-appeals system, the Providers couldn't avoid being terminated for at least some period of time, even if they succeeded in their appeal and the state ultimately reversed the terminations.
And again, though Kansas insisted the termination wouldn't take effect until September 10, meaning the Providers wouldn't lose funding until that date, it refused to extend the effective termination date itself to September. In doing so, the state created confusion around what effect the termination, slated to occur on July 7, would have had on the Providers and the Patients.

The issues it names are "whether the Providers are 'qualified' under 42 U.S.C. § 1396a(a)(23), whether the State properly terminated the Providers under Section 1396a(p)(1), and whether the nature of the relationship between the Providers and the National Office is legally significant." Appellant's Opening Br. at 29.

Kansas also argues that the district court conflictingly characterized the state administrative proceedings as both final and as having not yet begun. But these two characterizations do not conflict. The termination letters were final for justiciability purposes, and the Providers therefore had the option of appealing these final terminations via state administrative proceedings, though they chose not to. In fact, the Providers had the choice to pursue an administrative appeal only because the terminations were final. These circumstances are comparable to the rule that, absent certain, statutory exceptions, federal courts of appeals may hear appeals from only district courts' final decisions. See 28 U.S.C. §§ 1291, 1292.

Kansas claims that "[t]he district court concluded that there was no exhaustion requirement in this case because Section 1983 has no exhaustion requirement." Appellant's Opening Br. at 33 n.8. This is incorrect. The district court concluded that there was no exhaustion requirement in this case because it was not a civil enforcement proceeding under Sprint Communications and Brown . Mosier , 2016 WL 3597457, at *12-*13.

Because the district court limited its conclusion on this matter to the Patients and declined to address whether the Providers also had a private right of action, Mosier, 2016 WL 3597457, at *17, we too limit our analysis to the Patients. Kansas argues that doing so improperly allows "the Providers to piggyback on the alleged standing of the [Patients]," to bypass justiciability requirements, and to dodge the question of whether the Providers have a valid § 1983 claim. Appellant's Opening Br. at 44. But we don't need to consider PPGP's claims at all-the Patients' share the same complaint. See Planned Parenthood Ariz. Inc. v. Betlach , 727 F.3d 960, 966 n.4 (9th Cir. 2013) (suggesting that even if "the Medicaid free-choice-of-provider provision does not create a private right 'enforceable by health care providers' on their own behalf, ... 'Medicaid recipients ... have enforceable rights under [that provision].' " (second and third alterations in original) (quoting Silver v. Baggiano , 804 F.2d 1211, 1216-18 (11th Cir. 1986), abrogated on other grounds by Lapides v. Bd. of Regents of Univ. Sys. of Ga. , 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002) ) ).

Originally, the Gee panel ruled unanimously in favor of the Planned Parenthood plaintiffs. Planned Parenthood of Gulf Coast, Inc. v. Gee , 837 F.3d 477 (5th Cir. 2016), withdrawn and superseded by Planned Parenthood of Gulf Coast, Inc. v. Gee , 862 F.3d 445 (5th Cir. 2017). But after the panel filed its opinion, Judge Owen switched her vote, causing the panel to withdraw its unanimous opinion and replace it with a majority opinion in favor of the plaintiffs and a dissenting opinion from Judge Owen. Gee , 862 F.3d at 449. Later, the Fifth Circuit split 7 to 7 on a vote to rehear the case en banc. Planned Parenthood of Gulf Coast, Inc. v. Gee , 876 F.3d 699 (5th Cir. 2017) (per curiam).

In addition, this section contains several carefully defined exceptions, including some contained in other sections of the Medicaid Act. Specifically, § 1396a(a)(23)(B) includes exceptions for providers convicted of a felony "for an offense which the State agency determines is inconsistent with the best interests of beneficiaries under the State plan," and for providers under a new-provider temporary moratorium. This section also states that it does not apply in Puerto Rico, the Virgin Islands, and Guam. Id.

We don't read City of Rancho Palos Verdes as requiring us to presume that Congress foreclosed a private right of action under the Medicaid Act simply because it was enacted under the Spending Clause. The Court discussed the Gonzaga /Blessing framework for determining whether a statute creates a privately enforceable right under § 1983, and nowhere suggested that it intended to change or abandon this framework. City of Rancho Palos Verdes , 544 U.S. at 119-20, 125 S.Ct. 1453. Assuming that the plaintiff had met the Gonzaga - Blessing requirements and established a rebuttable presumption of individual enforcement under § 1983, the Court limited its analysis to the question of "whether Congress meant the judicial remedy expressly authorized by [the statute at issue] to coexist with an alternative remedy available in a § 1983 action." Id. at 120-21, 125 S.Ct. 1453. But, even if City of Rancho Palos Verdes "upended the Blessing 'presumption,' " A.W. v. Jersey City Pub. Schs. , 486 F.3d 791, 801 (3d Cir. 2007), and somehow required a presumption against private enforcement of Medicaid Act provisions, it wouldn't change our conclusion. Congress's individually-oriented, mandatory, and rights-creating language in the free-choice-of-provider provision is strong enough to overcome a presumption against individual enforcement actions, especially considering the weight of precedent favoring such individual enforcement.

The Eighth Circuit contends that Armstrong effectively overruled Wilder . See Gillespie , 867 F.3d at 1044-1046. Even if the Supreme Court had done so-and we do not think it did-it would not impact our analysis. We rely on Wilder not for its holding that the Medicaid Act confers on providers a right enforceable under § 1983 but for its conclusion that the Medicaid Act's administrative scheme isn't sufficiently comprehensive that it demonstrates Congress's intent to preclude enforcement under § 1983. Wilder , 496 U.S. at 522, 110 S.Ct. 2510. Armstrong neither discussed nor "plainly repudiate[d]" this portion of Wilder . Armstrong , 135 S.Ct. at 1386 n.*. Also, Wilder concerned an amendment to the Medicaid Act that has since been repealed. See Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4711, 111 Stat. 251, 507-08. And Wilder decided whether that amendment conferred private-enforcement rights on Medicaid providers, 496 U.S. at 510, 110 S.Ct. 2510, as opposed to our question here, which is whether a different section of the Medicaid Act confers private-enforcement rights on Medicaid patients. And importantly, Armstrong took issue only with Wilder 's implication that any time a statute imposes a binding obligation, it creates a private right of enforcement under § 1983. Armstrong , 135 S.Ct. at 1386 n.* (noting that Gonzaga rejected Wilder 's implication "that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983" (quoting Gonzaga , 536 U.S. at 283, 122 S.Ct. 2268 ) ). Armstrong did no more than reaffirm Gonzaga 's requirement that rights must be unambiguously conferred. Id . ; Gonzaga , 536 U.S. at 283, 122 S.Ct. 2268.

As we understand it, the dissent agrees with us that a provider can be terminated but remain qualified. Dissent at 1238 ("But other federal Medicaid provisions allow states to exclude providers even when they are considered 'qualified' under § 1396a(a)(23)."), 1242 (declaring that "Medicaid allows states to exclude providers from Medicaid, sometimes even when the providers are qualified. E.g. , 42 U.S.C. § 1396a(a)(39), (p)(1).").

Judge Shepherd's concurrence in Gillespie states that the previous four circuits are wrong that O'Bannon concerns only procedural rights, stating that this view "ignores the very language of O'Bannon . The Supreme Court clearly stated that it was defining the contours of the 'substantive right ... conferred by the statutes and regulations.' " 867 F.3d at 1048 (alteration in original) (quoting O'Bannon , 447 U.S. at 786, 100 S.Ct. 2467 ). But the language omitted from this quote matters. The whole sentence reads, "In holding that these provisions create a substantive right to remain in the home of one's choice absent specific cause for transfer, the Court of Appeals failed to give proper weight to the contours of the right conferred by the statutes and regulations."O'Bannon , 447 U.S. at 786, 100 S.Ct. 2467. We read this sentence to mean that § 1396a(a)(23) confers a substantive "right to continued benefits to pay for care in the qualified institution of his choice" but not a right to remain in a home that the state has already determined to be unqualified. Id. So the residents were asking the state to grant them procedural due process for a substantive right that they did not have.

Nor do we find it significant that PPFA does not offer abortions. Kansas relies on this irrelevant allegation to suggest that any sales of fetal tissue "could have been coordinated only through the abortion-providing 'affiliates' that [PPFA's national medical director] supervises." Appellant's Opening Br. at 53. The state seems to imply that this must mean that PPSLR and PPGP are doing the PFFA director's dirty work. This conclusion is both speculative and conclusory. Kansas presented no evidence showing that PPGP and PPSLR sold fetal tissue for profit, and neither of the two Kansas agencies that investigated PPGP and PPSLR found any wrongdoing.

Again, we follow the district court's lead in limiting our review on this issue to whether the Patients, as opposed to the Providers, met their burden of showing irreparable harm. Mosier , 2016 WL 3597457, at *23.

Kansas also disputes the district court's reliance on the possibility that if PPGP and PPSLR are terminated in Kansas, other states will terminate their Medicaid contracts as well. See Mosier , 2016 WL 3597457, at 24. We need not address this concern because we conclude that the Patients have established the risk of irreparable harm based on other grounds.